IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN M. PADDICK | : | CIVIL ACTION |
|     Movant | : | |
|     v. | : | NO.: 09-4285 |
| | : | |
| SHENECQUA BUTT; THERESA HOWARD; and. | : | |
| ELLEN BRONSON, a/k/a ELLEN BROWN | : | |
|     Respondents | : | |

| | | |
|---|---|---|
| RYAN M. PADDICK | : | CIVIL ACTION |
|     Movant | : | |
| v. | : | NO.: 13-374 |
| | : | |
| THERESA HOWARD | : | |
|     Respondent | : | |

**MEMORANDUM AND OPINION**

DAVID R. STRAWBRIDGE                      April 27, 2018
UNITED STATES MAGISTRATE JUDGE

Presently before the Court is a discharged attorney's motion to enforce a charging lien against the settlement fund ultimately obtained by his former clients. Following upon reports that all claims in the related cases (09-4285 and 13-374) had been settled, attorney Ryan Paddick Esq. ("Paddick"), former counsel for Plaintiffs Shenecqua Butt ("Butt"), Theresa Howard ("Howard"), and Ellen Brown ("Brown") (formerly Bronson) (hereinafter collectively "Former Clients"), filed two motions—a "Motion for Leave to Intervene for Recognition and Enforcement of Lien" (Doc. 305) and with it his companion "Motion for Recognition and Enforcement of Lien." ("Enforcement Motion") (Doc 306.)[1] On November 14, 2017, we ordered Sandra Thompson, Esq. ("Thompson"), current counsel for the Former Clients to file a

---

[1] As we are writing primarily for the parties who are familiar with the particulars in the case, we cite primarily to the 09-4285 docket designated for the consolidated cases unless otherwise noted. We discuss only those matters necessary to resolve the issues before us.

1

response to both of the Paddick motions, and that he reply. (Doc. 309.) Upon receipt of these briefings, we entered an Order granting Paddick's motion for leave to intervene. In the same order, we set a hearing date and granted leave to the Former Clients to file a surreply to Paddick's reply. (Doc. 327.) On January 13, 2018 Butt filed a "Motion for Recognition and Enforcement of Lien" against Tanya Mitchell, a former plaintiff, and Paddick. (Doc. 329.) Paddick responded to that motion on January 24, 2018. (Doc. 333.)

During the interim, and having a strong belief that this dispute cried out for a negotiated resolution, we consulted with counsel and recommended that they explore settlement discussions with the assistance of my colleague, United States Magistrate Judge Timothy R. Rice, who agreed to preside over such a conference. (Doc. 324.)[2] That effort was unavailing.

We then proceeded to an evidentiary hearing which began on February 2, 2018 and was continued on February 7 and 12, 2018. Testimony was taken from Marc Gelman, Esq., who represented the Carpenters Union and Edward Coryell and Mark Durkalec (collectively "Union Defendants") in both underlying cases, Catherine Straggas, Esq., who represented the Philadelphia Housing Authority ("PHA") in the 13-374 case, Mitchell, the one underlying

---

[2] As may become relevant to the discussion that follows, I had extensive involvement with these cases going back to two separate sessions exploring settlement, the first on July 30, 2013 (Doc. 68) and the second on September 19, 2013 (Doc. 72.) On September 26, 2013, following this second conference, Judge Baylson referred the matters to me "for all future pretrial matters." (Doc. 74.)

The docket reflects that from that date, and as discovery was ongoing, there were multiple extensions of the time to complete discovery (*See* Docs. 80, 84, 87, & 100), further extensions pertaining to expert discovery (*See* Docs. 122 & 128), and when the parties entered motions in limine and dispositive motions, the docket is replete with multiple extensions of time for briefing these matters. Ultimately the motions in limine were resolved by order and opinion on June 16, 2016 (Docs. 195-98) and the summary judgment motions filed by both the PHA and Union Defendants were resolved by Judge Baylson's adoption of my extensive Report and Recommendation ("R&R"), which recommended granting the motions in part and denying them in part. (Docs. 205 & 222.)

plaintiff who did not terminate Paddick, Paddick himself, Anthony Jackson, a disbarred attorney who assisted Paddick as a legal assistant in his representation of the Former Clients, each of the Former Clients, and Thompson. Both parties were instructed to file post-hearing briefs and have now done so. (Doc. 349, Doc. 351.)[3]

On the morning of February 12, 2018, as we convened for the last day of the hearing, the Former Clients filed a "Motion for Recusal [of me] filed by Ellen Brown, Shenecqua Butt, and Theresa Howard." ("Recusal Motion") (Doc. 343.) The motion was supplemented on February 13, 2018 with an affidavit from Butt. (Doc. 345.) I deferred ruling on that motion subject to the completion of the hearing, and in order to give Paddick an opportunity to respond. He did so on February 14, 2018. (Doc. 348.) These motions are all ripe for resolution.

By our accompanying order, we (1) grant with limitation Paddick's Enforcement Motion; (2) deny Butt's "Motion for Recognition and Enforcement of Lien" against Mitchell and Paddick; and (3) deny the Recusal Motion. We set out our reasoning below.

## I.     Enforcement Motion

### A.  Jurisdiction

Paddick asserts that we have subject matter jurisdiction over his enforcement lien by way of ancillary jurisdiction. (Doc. 306-3 at 1.) His Former Clients respond that we lack jurisdiction over this fee dispute "as the underlying case was dismissed a month before Paddick filed a motion to assert a lien and the asserted claims have no nexus to the underlying claims filed against the Union or PHA." (Doc. 328-1 at 2-3.) As to Butt's assertion of the lien against

---

[3] Transcripts have not been ordered by clients or counsel of either party. We also note that Paddick has filed a brief in reply to Respondent's final brief. (Doc. 353.) As we did not grant him leave to file such a reply, we do not consider the substance of this brief in reaching our final decision.

Paddick and Mitchell, she asserts that "There is ancillary jurisdiction to hear instant Movant's claims, because the Court is exercising jurisdiction of Ryan Paddick's claims." (Doc. 329-3 at 2.)

We begin by noting that under 28 U.S.C. § 1367, ancillary, or supplemental jurisdiction may be exercised "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." In *Novinger v. E.I. DuPont de Nemours & Co.*, the Third Circuit cited a commentator who noted that "[a]ncillary jurisdiction exists because without it the federal court neither could dispose of the principal case effectively nor do complete justice in the dispute that is before the tribunal." 809 F.2d 212, 217 (3d Cir. 1987) (citing 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3523, at 85 (1984). The Court continued to explain that

> This description of the purpose of ancillary jurisdiction suggests that it is particularly necessary for disputes such as this one. Attorneys' fee arrangements in diversity cases, and in most federal question cases as well, are matters primarily of state contract law. Nevertheless the federal forum has a vital interest in those arrangements because they bear directly upon the ability of the court to dispose of cases before it in a fair manner.

*Id*.

Thus, we conclude that this Court has ancillary jurisdiction over Paddick's claims under 28 U.S.C. § 1367 as the claims form part of the same case or controversy to the underlying suit. Without our exercising ancillary jurisdiction over these claims, the principal case could not be disposed of efficiently; nor could we do complete justice without deciding this dispute. *Novinger*, 809 F.2d at 217-18.

With regard to Butt's motion, however, we are not convinced that our jurisdiction over Paddick's claims compels us to exercise jurisdiction over that claim. These claims are

fundamentally different: Paddick's claim pertains directly to his efforts leading (or not) to the creation of the settlement fund; Butt's claims have nothing to do with creating the fund but rather are based upon an apparent separate agreement between her and co-plaintiff Mitchell where one (Butt) allegedly advanced money for counsel fees for the benefit of the other (Mitchell). We also observe that, unlike Paddick's enforcement claim, which requires extensive knowledge of the underlying litigation and the activities of the lawyers involved over several years, Butt's motion concerns a simple claim to enforce an asserted debt which Mitchell has stated in open court that she would pay. We decline to exercise jurisdiction over this claim.

### B. Parties Contentions

Paddick contends that he is entitled to recover from his Former Clients based upon the terms of two separate contracts: (1) the agreement to represent them in the Court of Appeals as they sought to overturn Judge Baylson's initial dismissal of the case ("Appellate Agreement") and (2) the agreement to represent them upon remand ("Contingency Fee Agreement" or "CFA"). Paddick's argument on the Appellate Agreement is simply that he is owed an outstanding balance to be paid under that agreement. With regard to the CFA, he argues that he has acquired an interest in the Respondent's settlement award through a charging lien. He then seeks damages on one of three bases: as a percentage of the fund; his lodestar for his time spent prior to his termination; or quantum meruit based on equitable principles. (Doc. 306-3.)

The Former Clients disagree. They assert that they paid the full amount Paddick was owed under the Appellate Agreement; that the CFA is void as it was signed under duress, and that even if it was not, Paddick breached the agreement and has "unclean hands" leaving him unable to recover in equity.

## C. Discussion

We examine these arguments as we recount the chronological history of the case and what we see as the relevant events to take into account. We then apply these considerations in the context of the law governing each particular issue. Ultimately, we conclude that Paddick's claims for his entitlement to fees under the Appellate Agreement are dependent upon the interpretation of the CFA. Accordingly, we discuss the CFA and the work completed by Paddick throughout his representation of his Former Clients.

### 1. Litigation leading to first Motion for Summary Judgment

This litigation began on September 21, 2009, when Butt, represented by counsel not involved in this current dispute, filed a complaint against the United Brotherhood of Carpenters & Joiners of America, Carpenter Health & Welfare Fund of Philadelphia & Vicinity ("Union"), Edward Coryell and Mark Durkalec asserting gender and race based discrimination and retaliation. (Doc. 1.) By amended complaint filed November 5, 2009, Mitchell and Allegra King[4] joined Butt as plaintiffs. (Doc. 6.) On June 2, 2010 and July 6, 2010, Howard and Brown respectively filed a complaint against the Union Defendants, asserting essentially the same claims as Butt and Mitchell. (10-2633, Doc. 1; 10-3269, Doc. 1.) On May 25, 2011, Judge Baylson ordered the cases consolidated for all discovery. (Doc. 38.) Discovery was undertaken between March and June 2011. The Union Defendants then filed a Motion for Summary Judgment which Judge Baylson granted on January 26, 2012. (Docs. 40, 55.) While not necessary for consideration of our case, it appears that the Karpf, Karpf & Cerutti, P.C. firm which had been representing all plaintiffs withdrew after the adverse ruling from Judge Baylson, leaving the plaintiffs to file a *pro se* Notice of Appeal to the Court of Appeals. (Doc. 56.) This

---

[4] King withdrew her participation in this suit well before the fee dispute issues arose.

history, which predates Howard's 13-374 suit against PHA and the Union for unrelated conduct concerning Howard's employment relationship with PHA, leads us to the first fee arrangement which was for the work done on the appeal.

## 2. Appellate Agreement

Upon filing their Notice of Appeal, and upon the Karpf firm's withdrawal, the then-five plaintiffs sought new counsel to represent them on the appeal. The Former Clients testified that they went to the NAACP offices in Philadelphia in search of legal assistance where they met Paddick. On February 21, 2012, they entered an agreement whereby Paddick agreed to represent them in connection with the appeal. Paddick presented two copies of the agreement, one signed by Butt, and one signed by Howard. (M-1.)[5] The latter document lists Butt, Howard, King, and Brown as clients. Although there was no signed contract from Brown offered into evidence, she testified that she entered into an identical agreement as her co-plaintiffs. (R-2 at 1-2.) We accept that all three former clients were parties to the same agreement and are so bound.

The Former Clients have identified several issues associated with this agreement.[6] The principal question is whether the fee to be paid was capped at $15,000, as the Former Clients assert, and if not, whether Paddick is entitled to all or any portion of the additional $13,757.50 that he has billed. (R. 349 at 10.) As we are responding to Paddick Enforcement Motion, we must look to whether Paddick has established a charging lien, and if so whether the scope of that lien reached back to work done under the Appellate Agreement. As we set out within, we

---

[5] We refer to Paddick's trial exhibits as "M-" for "Movant" and Former Clients' trial exhibits as "R-" for "Respondent."

[6] These issues include: whether clients were joint and severally liable for performance of the contract; whether there was an oral agreement to cap the payment at $15,000; and the impact of Paddick's failure to secure the payment of costs after the successful appeal.

conclude that he has established a valid charging lien, but he has failed to establish that that lien reaches back to include the work done pursuing the appeal. Accordingly, it is not for us to resolve the issues the parties identified under the Appellate Agreement.

### 3. Contingency Fee Agreements

On January 6, 2013, the eve of oral argument before the Court of Appeals, Paddick and his Former Clients entered into contingency fee agreements whereby Paddick would, following remand, be paid from the proceeds of any recovery at trial or from settlement. (M-2.) The Former Clients argue that this fee agreement is void as they signed it only under duress when Paddick threatened not to appear for oral argument. (Doc. 311 at 2-3.) They also assert, should this first argument fail, that Paddick breached the agreement by refusing to advance litigation costs as they say he was obligated to do under the arrangement and by failing to secure an economic expert. (*Id*. at 3-4.) This, they claim, was a material breach which discharged them of their responsibility to perform under the contract. (Doc. 311-2 at 5.) We address each of these arguments in turn, and then address the ability of Paddick to recover fees from the appellate work under this agreement.

### a. Duress

We first address the issue of the alleged coercion, or duress. We have testimony from the Former Clients that Paddick was particularly forceful in seeking to reach finality in the role that he would play in the event the Court of Appeals reversed and remanded the case back to District Court. (*See also* R-3 at 3.) Paddick has strongly denied this charge and asserted vigorously that he did not engage in any such misconduct. (*See* M-9 at 3.) The parties agree that the CFAs were signed during a meeting at the NAACP office where Jackson, who was involved with the NAACP's Social Justice Law project and was assisting Paddick was also present. Jackson

testified in support of Paddick on this issue, stating that he (Jackson) participated in the meeting where there was an orderly, albeit brief discussion about the upcoming oral argument, a review of the papers Paddick had filed, a prayer, and the signing of the CFAs.  He stated that this discussion took about 10 minutes.  (*See also* M-8.)  Howard also testified about the meeting and said that Paddick did not walk the parties through each line in the agreement.  In her affidavit, Butt stated "Attorney Paddick and Mr. Jackson threatened not to appear for oral argument in the Third Circuit Court of Appeals unless we also agreed to allow them to take the case if the appeal was won."  (R-3 at 3.)  Although Howard and Brown did not discuss duress in their affidavits, both testified that they had the impression during the meeting that they had to sign the agreement in order for Paddick to show up to oral argument.  Mitchell disagreed, and testified that Paddick never threatened to not show up for oral argument.

Turning to the agreements themselves, we see nothing out of the ordinary.  These are relatively standard CFAs, and there are no particularly abnormal terms.  As to the clients obligations, the CFA provides:

> Client agrees to pay Law Office the greater of the following fees:
> (a) Client agrees to pay a fee for time and efforts by attorney Forty Percent (40%) of net proceeds of any settlement or judgment and attorney's fees awarded; or should the Court award attorneys' fees
> (b) Client agrees attorneys shall be owed at the rate shall of $350.00 per hour.

(M-2.)

We begin this discussion with the understanding that "parties are bound by their agreements, absent fraud, misrepresentation or duress… without regard to whether the terms were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains."  *Sabad v. Fessenden*, 825 A.2d 682, 688 (Pa. Super. 2003) (citing *Simeone v.*

*Simeone*, 581 A.2d 162, 165 (Pa. 1990).  In Pennsylvania, duress is defined as "that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 986 (Pa. Super. 1997) (citing *Carrier v. William Penn Broadcasting Co.,* 233 A.2d 519, 521 (Pa. 1967)).  In order to succeed in a claim for duress, a party "must show a wrongful act or threat by the other party that left the victim no reasonable alternative."  *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 695 (E.D. Pa. 1993).

A fraud or duress claim in Pennsylvania must be proven by "clear and convincing evidence." *Rohm & Haas Co. v. Cont'l Cas. Co.,* 781 A.2d 1172, 1179 (Pa 2001).  This standard requires that the evidence be "so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts of the issue." *Id*. (citing *Lessner v. Rubinson,* 592 A.2d 678, 681 (Pa. 1991)); *see also Sabad*, 825 A.2d at 691.

Understanding that the Former Clients testified vigorously about duress, they have failed to convince us that there is "clear and convincing" evidence of sufficient weight as to void the contract.  We observe that Howard emailed Paddick on February 1, 2013, a month after she signed the CFA, and after the case had been successfully remanded, thanking him for his representation.  (M-29.)  At the same time, we accept that by October 2013 Butt, who came to be the informal spokeswoman for the Former Clients, wrote to Paddick stating that "I have concerns about trial and being prepared and I believe we need someone with civil experience to help out with the case and don't want to be procrastinating till last minute getting things done."  (M-19.)  She also discussed the issue of alleged coercion with Jackson in November of 2013 but took no

action. (R-4 at 2-5.)[7] Despite these concerns, and understanding that the agreement provides that "Client has the authority to discharge attorney at any time," (M-2) the Former Clients did not terminate their relationship with Paddick until late April of 2015, over eighteen months after Butt's email to Paddick expressing concerns about procrastination, and *over two years* after the signing of the original agreement.

Moreover, we consider the Former Clients' claims that Paddick threatened to pull out from arguing before the Court of Appeals as unlikely, particularly where he would have certainly known that he would have little prospect of succeeding.[8] In reviewing the evidence on the whole, we find Paddick's testimony on this point more credible than that which was offered by the Former Clients. The Former Clients have failed to carry their burden of showing by clear and convincing evidence that the agreement was the product of duress.

### b. The cost of paying for obtaining experts

As we have found that the contract is enforceable, we next examine the primary dispute about the substance of the agreement—that is: who was responsible under the CFA for paying

---

[7] The Former Clients argue that their attempts to find new counsel were "thwarted by being threatened by Attorney Paddick and/or Anthony Jackson who stated that no judge would believe them and they would be considered argumentative and 'ungrateful' which would harm their case." (Doc. 335 at 3.) When asked about this exchange, Jackson testified only that he never told the Former Clients they could not fire Paddick.

[8] We assume that Paddick's alleged threat, had it been realized, would have taken the form of a motion to reschedule oral argument or a motion to withdraw. The Third Circuit Local Appellate Rules state that "[t]he court will grant a motion requesting rescheduling of the [oral] argument only where the moving party shows extraordinary circumstances." Rule 34.1(d). When reviewing a motion to withdraw, "a Court may consider…: (1) the reason why withdrawal is sought; (2) the prejudice withdrawal may cause to litigants; (3) the harm withdrawal might cause to the administration of justice; and (4) the degree to which withdrawal will delay resolution of the case." *Wolgin v. Smith*, No. 1996 WL 482943, at *2 (E.D. Pa. Aug. 21, 1996). In light of this rule and precedent, we find it highly improbable that Paddick would have not appeared for oral argument the following day after meeting with his Former Clients.

the initial cost of retaining experts. We also examine whether this dispute caused any harm to the Former Clients. While ultimately the agreement provides that the clients are "responsible for reimbursement of all expenses (such as court costs, transcripts, telephone, travel and lodging, postage, copying, expert witness fees, etc.). . . Such expenses as are advanced by attorney and have not been paid by client directly shall be deducted by attorney from client's share of any money recovered," the agreement also states that "Client agrees to reimburse Law Office for all costs associated with the action and pay 1/3 of costs within 30 days of the report of such costs. . . . Such costs may and will likely include: filing fees, *expert witness fees*. . . and any other direct costs of the case." (M-2) (emphasis added.)

The Former Clients argue from this language that Paddick was obligated to initially fund the cost of obtaining an expert, and that his failure to do so constituted a breach of the agreement. They assert that at least as early as November 2014, Paddick knew that he did not have funding to retain an expert witness. (R-14.) He did, however, identify some potential experts who were not retained at that point as the Former Clients could or would not contribute to the payment of their retainer. Paddick argues that the provision in the agreement that "Client understands that he/she is also responsible for reimbursement of all expenses" (M-2) puts the burden of paying the expert on the clients. (Doc. 317 at 4-5.) While he is right about the language of the agreement, we are troubled by the unfortunate lack of clarity created by these clauses in combination when the real issue was not reimbursement but who would fund the case when funds were needed. We understand that the clients' assumption was that he would secure the appropriate expert subject to the reimbursement provision in the policy.

The record contains text message and email communications between Paddick and certain of his Former Clients, usually Butt, on this topic. In an August 2014 email, Butt stated

"we are not responsible for expert witness fees. If you believe this to be wrong please point out in contract." (R-1 at 12; *see also* R-9 at 1-6, 14-17.) We find nowhere in the evidence produced that he did so. He did, however, seek help from other attorneys. On November 7, 2014, over five months before his termination, Paddick emailed Alice Ballard, Esq. stating "it is time to have experts issue a report. And, frankly neither I or my clients have the funds right now…. If new counsel is to step in or collaborate, it should be soon because expert reports are currently due November 21." (R-14.) In March 2015, a month before he was terminated, he told the clients that they were free to change counsel if they were not willing to contribute to the cost of an expert or proceed without one. (R-8.) Regardless of that email, we conclude that Paddick failed to communicate clearly with his clients regarding their responsibility to reimburse him for the cost of retaining an expert.[9] But, for reasons we discuss within, the Former Clients are unable to show that this circumstance brought them any significant harm. We take this into account as we discuss his entitlement under a quantum meruit analysis.

### c. Recovery of fees from appellate work

We next consider Paddick's claim that he is entitled to recoupment of unpaid fees under the Appellate Agreement from the contingency fee agreement settlement fund even when he has been terminated. The CFA states that:

---

[9] Under the Pennsylvania Rules of Professional Conduct, a lawyer "provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications." 204 PA. CODE § 81.1(2) (2004). The Rules also state that a "contingency fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingency fee is calculated." *Id.* at § 81.4, Rule 1.5(c).

> Client has the authority to discharge attorney at any time and have the entire file returned. Discharge of attorney does not avoid duty to pay fees hereunder. Client also agrees that attorney shall have the right to withdraw representation, subject to court approval, in the event client breaches this agreement or there is a breakdown in the attorney-client relationship and there is no prejudice to client.
>
> Client further agrees that in such event, *any unpaid fees* which may be due to attorney may be obtained directly from the proceeds recovered by client from any defendant prior to the distribution of such funds to client.

(M-2 at 3) (emphasis added.)

Paddick argues that the "any unpaid fees" language was intended to incorporate unpaid fees from the Appellate Agreement. We reject this assertion. This provision makes no specific reference to past due fees under any other agreement. We see this provision is ambiguous at best, leaving us to construe it against Paddick, as the drafter of the agreement. *See Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 506 n.10 (E.D. Pa. 2014) (citing *Sun Co., Inc. (R & M) v. Pa. Tpk. Comm'n,* 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) ("Under the rule of *contra proferentem,* for any *ambiguous* language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable.") Paddick is not entitled to take what he asserts as "any unpaid fees" of the Appellate Agreement from the CFA.

### 4. Work completed after the contingency fee arrangement

The CFA was signed on April 6, 2013. On January 23, 2013, Paddick filed a second complaint on behalf of Howard, stating new claims against the Union Defendants and joining the PHA as a named defendant. (13-374, Doc. 1.) He filed an amended complaint on May 6, 2013, and a second amended complaint on August 19, 2013, ultimately alleging race and sex discrimination, retaliation, breach of contract, and a violation of the Labor Management Relations Act. (13-374, Doc. 28.) On January 31, 2013, the Court of Appeals sent the 09-4285

case back to Judge Baylson. (Doc. 59.) The cases were consolidated for discovery, and further discovery continued. (13-374, Doc. 42.)

### a. Completion of discovery

There was considerable work done on the cases from the January 2013 dates when the 13-374 case began and the 09-4285 case was remanded to the time that Paddick was terminated in April 2015 and Thompson undertook representation of the Former Clients. During that time, there were numerous depositions taken. Most of these depositions were noticed by Paddick and focused upon the core issues—in the 09-4285 case: the role of the Union in assisting Plaintiffs and others similarly situated to secure work; what control the Union had over employers who were actually making hiring decisions; and in the 13-374 case: evidence that certain Union member supervisory personnel at the PHA created a hostile work environment as claimed by Howard. Paddick testified that between the remand of the case (January 2013) and Thompson's entrance of appearance (April 2015), he took "24 depositions… [presented] 2 oral arguments on motions… [attended] 2 settlement conferences [and] 6 telephone conferences… [submitted] 9 substantive motions or responses, [attended] Initial Pre-Trial Conference in PHA case… [and wrote] Rule 26(f) report for PHA case." (Doc. 349, 4-5.) By the time that Thompson entered the case in May 2015, discovery had been closed for at least three months[10] and summary judgment motions were not filed until November 2015. (Doc. 148, 150.)

The Former Clients take issue with the discovery conducted by Paddick, arguing that certain flaws and the mistakes discussed below should lead us to conclude that Paddick's work

---

[10] The Rule 26(f) report submitted by the parties in the 13-374 case requested that all discovery be completed by September 9, 2013. (13-374, Doc. 9 at 6.) The two cases were later consolidated, and we extended the period of discovery for limited purposes until January 23, 2015. (Doc. 111.)

did not substantially contribute to the creation of the fund. Specifically, they argue: (1) that Paddick did not "diligently pursue discovery to establish the claims and culpability of all named Defendants;" (2) that he "failed to request the employment data for all the Locals who were supervised by Edward Coryell;" (3) that he "failed to request documentation and effectively conduct discovery to support Respondents' retaliation claims so that they were dismissed;" (4) that he failed to provide a brief in support of his motion to enforce a subpoena against the Department of Labor ("DOL"), causing it to be denied; and (5) that he "failed to seek, contract with, and pay a psychological expert to helps support Respondents' claims of severe emotional distress." (R. 312.)

We discuss the first three of these issues together as they all concern claims of Paddick's failure to seek certain documents or information in discovery. What the Former Clients do not do, however, is set out what documents or evidence would have been developed if this discovery had been undertaken, leading us inevitably into areas of speculation that we cannot avoid. Further, these claims lack specificity and any assessment on our part would have to be based on what the information or documents were and what they would have shown. The Former Clients give us nothing on what these documents would have shown, had they been obtained, nor how they would have impacted the litigation, and whether they would have even supported their case. We also note that new counsel failed to request an extension of time to conduct discovery.

More specifically, the Former Clients complain about Paddick's failure to enforce a subpoena to take the deposition of a Department of Labor ("DOL") investigator. Although Paddick failed to comply with local motion practice rules, allowing the Court to dismiss a motion on this ground alone, the order we entered on the motion makes plain that the case law did not support the Former Clients' claim that DOL employees, absent special circumstances not present

here, would be permitted to testify in civil cases when the government is not a party. (*See* Doc. 119.) While we pointed out Paddick's error in failing to file a supportive memorandum with his motion, our decision was based upon the legal insufficiencies of Paddick's position, and not merely the result of a careless error on his part. Substantively, we give no weight to this allegation.

We acknowledge the difficulty over the prompt selection of the psychological expert and Paddick's failure to communicate effectively on this topic. We are unpersuaded, however, that this failure made any difference in the outcome of the case. We first note that this argument does not center on the merits of the claim but rather the damage aspects of Butt and Howard's emotional distress claims. More importantly, Paddick's failure to obtain an expert to assess the emotional distress damages did not foreclose these Former Clients from raising emotional distress as a damage item at trial. Further, Thompson did obtain an expert to offer opinions as to the purported PTSD and emotional distress claims suffered by both Butt and Howard. Following the Union defendant's Motion in Limine, the expert was permitted to testify to bolster these plaintiffs' compensatory damages claims as long as he did not offer any legal conclusion or credibility opinion. (Doc. 196.) The former clients faced no measurable harm from Paddick's difficulty here.

### b. 2013 settlement conference

In support of his motion, Paddick relies heavily upon offers given in a settlement conference held before me in September of 2013. We have testimony that there was an articulated offer of $250,000 from counsel for the Union to resolve all claims against Union Defendants. Gelman, counsel for the Union Defendants, testified that he made this offer at the time of the conference. Gelman also testified that he had authority up to $300,000 to resolve the

claims, but this higher figure was never communicated to Plaintiffs. (*See also* M-6.) We also heard testimony that at a settlement conference in 2011 before summary judgment was granted, while the Karpf firm was representing Plaintiffs, an offer of $100,000 was made to settle the claims of the then-five plaintiffs.

The essence of this argument calls for a comparison between the $95,000 per plaintiff ultimately obtained, the $62,500 per plaintiff offered in 2013, and the $20,000 per plaintiff offered to in 2011.[11] We accept that the value of the cases as perceived by the Union Defendants and the PHA is relevant to the consideration of the value of Paddick's work on the case. While we have considered Paddick's argument and give it some weight, it is not without flaws.

We note initially that Paddick engaged in substantial discovery. We fear, however, that any assessment regarding how this discovery impacted upon settlement value would be somewhat speculative, noting that from a damage point of view, the case could have increased in value for no other reason than that the counsel fee damage element would have been significantly higher. Having thirteen years of experience on a nearly daily basis of presiding over settlement conferences, this Court is well aware that approaching trial dates lead to differing risk assessments by the litigants, and are often driven by factors unrelated to the underlying merits of their cases. Clearly the Union Defendants and the PHA felt that they had a liability risk—and they had the cost of defense to consider. While liability assessments would certainly come into play, we are unwilling to speculate as to any particular action or inaction by Paddick, or by Thompson, had a measurable effect upon the Defendant's settlement analysis. At the same time, we believe that the certainty of counsel fees in the case of a Plaintiff's verdict at trial would have a significant impact upon the Defendant's settlement analysis.

---

[11] Ms. King, the fifth plaintiff, was still in the case at the time of this conference.

### c. Butt and Brown's Davis-Bacon Act claims and Brown's separate retaliation claim

Butt and Brown assert that Paddick accepted money from them to file Davis-Bacon Act claims and that he never made such filings. Both women testified that they paid Paddick $1,000 as a retainer for representing them in this claim, and that he missed the deadline for filing. (*See also* R-6 at 10-11, R-7 at 4.) Paddick denies that this was the case. (M-9 at 2-3.) Brown's declaration says that "Attorney Paddick used discovery in this case to try to support Davis-Bacon Act claims for me [and] Shenecqua Butt." (R-7 at 4.) The Former Clients submit a blank retainer agreement which states that Paddick would be representing the client in claims pursuant to "Davis Bacon Act and/or the Wage and Hour Act." (R-15.) The "agreement" does not, however, state client names and is not signed by either party. They also present a letter to a DOL official wherein Paddick wrote "I represent Shenecqua Butt regarding her claim of being underpaid by… PHA… the amounts she was due pursuant to the Davis Bacon Act for federally funded work." (R-21.)

In light of these two submissions, the testimony, and our discussion of the DOL subpoena above, we conclude that Paddick did communicate to the DOL that he was representing Butt and Brown in these claims but was unsuccessful as the relevant investigation had concluded and payments had been made prior to Paddick's involvement, as he states in his declaration. (M-9 at 2.) There were certainly communication failures and an apparent failure to investigate the nature and status of the claims, but at the same time we have not been presented with any cancelled checks, receipts, or contemporaneous emails or text messages supporting the Butt and Brown claim that they paid $1,000 each to Paddick. We cannot accept that these payments were made without any supporting documentation. In any event, these efforts are not sufficiently related to the creation of the fund, so we cannot consider them in reaching our quantum meruit award.

Brown also testified that Paddick told her that he was going to help her file a retaliation claim after she was terminated following the September 2013 settlement conference, but he never did. (R-2 at 2.) She understood that she had him on retainer to file other claims under the CFA. Although we will consider this testimony in reaching our ultimate assessment, we will give it little weight particularly where we have not been presented with evidence of the factual basis for this claim or its likelihood of success. Thus, we will not speculate on any alleged damages that may have been a result of a failure to pursue this claim.

### 5. Paddick's termination, Thompson's entry and Paddick's lien assertion

Paddick was terminated in April 2015. Thompson entered her appearance on behalf of the Former Clients on May 1, 2015. (Docs. 124-26.) We accept the Former Clients' evidence that this change came about in part over their concern about Paddick's inability to fund the retention of an economic expert. On March 3, 2015, just two months earlier and apparently motivated by some personal financial difficulties, he emailed his former clients, stating "As previously mentioned, we all need to contribute to this or the case will have to go forward without an expert. Also, as discussed, as much as I would like to continue with the case, if this puts you in a position where you feel the need to change counsel, I will cooperate with any new counsel." (R-8.)

The Former Clients did indeed "feel the need to change counsel" and responded by terminating their relationship with Paddick and retaining Thompson. Mitchell stayed with Paddick. Shortly after Thompson's entry in May 2015, she coordinated with Paddick in requesting an extension of time to file expert reports so they could retain an economic expert. (M-18.) Thompson, acknowledging Paddick's statement noting the contributions he made to the case up to that point, emailed Paddick stating that "I saw an email stating that you wanted to

preserve the time you had invested in the case. I assume if Tanya Mitchell stays with you, then you can reap benefit from whatever time you spent." (R-1 at 9.) Paddick responded to that email stating that

> I will need to be reimbursed for expenses before forwarding the file. My time and fee is to be protected per the agreement they made with me. I am not waiving that for any of the clients. I have invested a great deal of time and money in this case and must be compensated for the same. I took and won their appeal at a time when no other attorney would touch their case.

(R-1 at 8-9.)

This issue was unsurprisingly joined. In October 2015, Paddick sent a copy of his fee arrangement for the appellate work to Thompson, stating the "hourly from the time spent on the appeal remains due. Also, fees remain due on the work I did on the cases prior to your stepping in." (M-16.) Thompson did not respond, perhaps relying upon her earlier note telling Paddick that he could "reap benefit" from his agreement with Mitchell. By all accounts the matter was pushed aside.

### 6. Motions for Summary Judgment and Consent Jurisdiction

On November 30, 2015, all defendants filed motions for summary judgment. (Docs. 148, 150, 151.) Following multiple extensions, Paddick filed a response on behalf of Mitchell on March 1, 2016, the final due date. (Doc. 172.) On March 2, 2016, on behalf of the former clients, Thompson filed a *nunc pro tunc* response with no substantive brief where she stated that they "join in and incorporate by reference the Memorandum of Law filed by Plaintiff Mitchell at No. 172." (Doc. 177 at 2.) Paddick addresses this circumstance to support his assertion that Thompson was unjustly enriched by the work that he had done on the case. The Former Clients respond that he primarily used his brief to the Third Circuit as a template for his responsive brief. The Former Clients' argument falls flat, as the brief to the Third Circuit was based on Judge

Baylson's grant of summary judgment, not arguments made after the case was remanded and extensive discovery was undertaken.

On August 19, 2016, in a Report and Recommendation ("R&R") to Judge Baylson, I recommended that he grant the summary judgment motions in part and deny them part, allowing some claims to go forward. (Doc. 205.) My recommendation left each plaintiff with some viable claims going forward. In the 09-4285 case, which focused upon the Union's role in obtaining work for Union members, including plaintiffs, I granted Coryell's motion on the § 1981 claim, Coryell and Durklalec's motion on the Title VII claim and the motion by all defendants on their retaliation claims. In the 13-374 case, which focused upon Howard's treatment as a PHA employee, I granted the Union and the PHA's motions on all claims except Howard's claims of race and gender discrimination against the PHA. On May 1, 2017, Judge Baylson overruled all objections and adopted the R&R on May 15, 2017. (Doc. 222.) On May 19, 2017, the parties consented to jurisdiction before a magistrate judge, who they knew would be me. (Doc. 232, R-1 at 65-66.)

The Former Clients assert that Paddick caused their disparate impact and retaliation claims to be dismissed. First, as noted during the pretrial conference and various other conversations with counsel leading to trial, there were never disparate impact claims pled in the complaints that were consolidated into the 09-4285 case. Paddick was not representing the Former Clients when these complaints were filed. We cannot associate any failing here with him (if it was a failing), given his entering into the case over two years later.

With regard to their argument about the retaliation claims, we recommended granting the Union Defendant's motion for summary judgment in the 09-4285 case as to the retaliation claims for a number of reasons, including Butt and Howard's failure to show that they suffered adverse

employment consequences, and that there was an adequate causal nexus between their protected activity and any adverse employment action. We recommended that summary judgment be granted in favor of the Union on the retaliation claims in Howard's 13-374 case as she "[did] not set out with clarity what she considers to be her protected activity, nor the allegedly adverse actions which occurred as a result of her engaging in protected activities." (Doc. 205-1 at 40.) It is significant that Thompson, not Paddick, was representing the Former Clients at this point.

### 7. Pretrial Motions and Final Settlement

We decided a number of pretrial motions before and after the parties consented to magistrate judge jurisdiction. As noted above, when Thompson joined the case, she filed a motion for extension of the time to file expert disclosures. That motion was granted. (Docs. 127 & 128.). Thompson then timely identified psychological and economic experts and produced their reports. On November 9, 2015, Union Defendants filed motions to exclude these experts. (Docs. 142 & 143.) Both Paddick and Thompson filed responses on behalf of their clients. (Docs. 153-57.) On June 16, 2016, we granted the motions in part and denied them in part. (Doc. 195-98.) In particular, we precluded the psychological expert from offering legal opinions or assessments of credibility of the parties, and we precluded the economic expert from presenting his report based upon our Daubert analysis when we concluded that plaintiffs failed to establish reliability and "fit" to the case. (Docs. 195 & 197.) Paddick critiques Thompson, arguing that this economic expert "made mistakes in their report, relying on incorrect information from new counsel," leading to the Court's exclusion of that expert's report. (Doc. 317 at 4.)

In late August 2017, counsel for the Union Defendants wrote to us for clarification concerning § 1981 claims still pending against Coryell and Durkalec in the 13-374 case. We

allowed written and oral argument on this issue, and on September 27, 2017, we issued an order which precluded Howard's purported § 1981 in the 13-374 case as it had not been properly plead. (Doc. 303.) Howard was however left with Title VII and PHRA race and gender discrimination claims against the PHA in the 13-374 case.

The Former Clients blame Paddick for our decision to preclude this claim from going forward at trial. However, they have failed to convince us that the settlement value of the claims under Title VII and the PHRA for discriminatory conduct would have been materially greater if the § 1981 claims, which would have been based on race alone and not gender, had been pursued. Any assessment of the extent of Paddick's failure upon settlement value would be speculative.

A number of motions in limine were filed as well—eight in the 09-4285 case (Docs. 258-65) and seven in the 13-374 case. (Docs. 81-86, 89.) During a pretrial conference on September 17, 2017, we decided many of these, and followed that conference with an order denying, granting, or preserving certain motions for trial. (Doc. 302.) The relevant decision at least in Paddick's view was our determination to preclude statistical evidence from presentation at trial. He had argued that Thompson "jeopardized the case" during the pretrial conference "when she argued a disparate impact theory as a reason to allow work hours data to come in, when there was no disparate impact claim." (Doc. 316.)

We conclude that Paddick was correct about Thompson's presentation of this misplaced argument. It is also true, however, that there were several other reasons for the decision to exclude the economic expert and his statistical data from coming in at trial. (Docs. 198 & 302.) While Thompson's performance played a role, these results would likely have been the same. Further, while we are mindful that Thompson's performance is not *per se* an issue before us, as

this lien was only filed against the fund created, we cannot ignore evidence pertaining to Thompson's role in creating the fund as we consider Paddick's role. *Cf. Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 179 A.3d 1093 (Pa. Mar. 6, 2018) (holding that predecessor counsel could recover from successor counsel in lawsuit between the two firms.)

On September 25, 2017, the day before the final pretrial conference, the PHA informed us that they had reached a settlement with Howard in the 13-374 case. On September 29, 2017, the Union Defendants and all plaintiffs in the 09-4285 case also reached a settlement. Fed. R. Civ. P. 41.1(b) orders were entered in both cases on October 3, 2017. (Docs. 304; 13-374, Doc. 115.)

### D. Relief Due

As we have decided that Paddick is not due anything beyond the $15,000 paid under the Appellate Agreement from the settlement fund, we return to the issue of whether Paddick has successfully asserted a charging lien, and if so, what he can recover for his work under the contingency fee agreement.[12] As the parties have suggested, we look to the analysis laid out in *Recht v. Urban Redevelopment Authority*, the Pennsylvania Supreme Court established that to prevail in asserting a lien, the attorney must demonstrate that:

> (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees, or other disbursements incurred in the litigation by which the fund

---

[12] By concluding that Paddick cannot recover what he believed to be sums due under the Appellate Agreement from the settlement fund, we are expressing no view on whether these sums are properly due and owing.

was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

168 A.2d 134, 138-9 (Pa. 1961).

Paddick asserts that he has satisfied all of the *Recht* factors, while the Former Clients claim that he has failed to satisfy factors two through five. (Docs. 349 & 351.) Regarding the first *Recht* factor, it is undisputed "that there is a fund in court or otherwise applicable for distribution on equitable principles." 168 A.2d at 138-9. In our order of December 28, 2017, we granted Thompson leave to disburse any amount above that to which Paddick has asserted a claim, but ordered that the "contested portion must be maintained in Ms. Thompson's escrow account pending resolution of the motion." (Doc. 321.)[13] This factor has been satisfied.

We are also satisfied that the second factor—that "the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid"—has been met. 168 A.2d at 138-9. In *Matter of Independent Pier Co.*, the Court denied the motion to assert a lien where former counsel had filed suit three years before settlement, but where it was subsequent counsel undertook "specific discovery, investigatory and expert, [and] efforts in pretrial and trial preparation activities" which "reflect… a classic recitation of extensive attorney litigation services culminating in trial and/or settlement, whereas [former attorney's] time records… reflect a few initial stabs at discovery." 210 B.R. 261, 265 (E.D. Pa. 1997). Here, previous counsel filed the 09-4285 suit, but Paddick filed the 13-374 suit for Howard, and managed all of the extensive discovery on both cases before Thompson even entered her

---

[13] On March 27, 2018, Paddick filed a "Motion to Verify Compliance with December 27, 201[7] Court Order Regarding Withholding of Funds." (Doc. 354.) We issued an order that same day, denying his motion with prejudice to renew if appropriate, as we found that Paddick had "given us no reason to believe that Thompson has taken any action putting her out of full compliance with [our December 27, 2018] order." (Doc. 355.)

appearance. While Thompson ultimately secured the settlement fund, we are unable to say that she would have done so without Paddick's efforts while he was representing the Former Clients. Paddick further points out that he secured the $250,000 settlement proposal in 2013, where the Defendants evaluated the cases such as to be prepared to offer up to $300,000.

We next conclude that Paddick has satisfied the third *Recht* factor which requires the attorney asserting the lien to show "that it was agreed that counsel would look to the fund rather than the client for his compensation." 168 A.2d at 138-9. It is clear in the CFA that Paddick would look to the fund rather than to the Former Clients themselves. The CFA clearly resolves this question. (M-2 at 1) (cited in Part I.C.3.c.) This element is satisfied.

The fourth *Recht* factor which requires counsel to demonstrate "that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised" has been satisfied. 168 A.2d at 138-9. Here Paddick has asserted entitlement to the balance due under the Appellate Agreement, but as this was based upon the separate agreement, we have rejected this claim and have limited him to relief associated with the creation of the settlement fund.

The fifth and final *Recht* factor calls for us to consider whether there are "equitable considerations which necessitate the recognition and application of the charging lien." *Id.* We have set out within our assessment of the various matters that the Former Clients believe disqualify Paddick from any award: that he has "unclean hands" from forcing the signing of this agreement under duress, and that he breach of the agreement by not paying for experts. (Doc. 351 at 17-18.) We have already determined that the Former Clients' argument on the duress is unavailing. Paddick's actions certainly do not constitute "illegal or immoral acts" which could bar recovery in quantum meruit. *Mulholland v. Kearns*, 822 F. Supp. 1161, 1170 (E.D. Pa.

1993). In *Mulholland*, after clients fired their attorney because of "his inability to move the case forward," they hired a new attorney who obtained a settlement. *Id*. at 1164. When terminated attorney argued that he performed 85% of the work on the case and asserted his lien, clients responded that he was prohibited from recovering as he was fired for good cause. *Id*. The Court found that "[a]ny inadequacy in [the former attorney's] representation of the plaintiff goes to the amount of quantum meruit recovery" and that "[b]ecause [the former attorney] was terminated for cause, but not for wrongful acts, defendants are entitled to compensation quantum meruit for the reasonable value of their services before termination." *Id*. at 1170. As we have not been presented with convincing evidence that Paddick has committed illegal acts in his representation of the Former Clients, we consider the inadequacies in his representation, which have been outlined within, as considerations determining the extent of his entitlement in quantum meruit. Fundamentally, where the Former Clients were unwilling to negotiate any compromise by insisting that Paddick should receive no benefit for reasons we find unconvincing, we have no alternative other than to accept Paddick's right to have his lien assessed.

As we have found that Paddick can properly assert a charging lien on the fund, the next issue is whether that recovery may be had under a contract theory, which would permit him to recover under the termination clause in the contingency fee arrangement, or under quantum meruit, which is defined as "as much as deserved" under equitable principles. *Angino & Rovner v. Jeffrey R. Lessin & Assoc.*, 131 A.2d 502, 508 (Pa. Super 2016) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, PC,* 95 A.3d 893, 896 (Pa.Super.2014), *rev'd* 2018 WL 1161550 (Pa. Mar. 6, 2018.)).

It is well-settled law in Pennsylvania that a client may discharge an attorney at any time for any reason. *See Kenis v. Peini Corp.,* 682 A.2d 845, 849 (Pa. Super. 1996) ("under

Pennsylvania law, a client has the absolute right to terminate an attorney-client relationship, regardless of any contractual arrangement between the two parties."); *see also Mager v. Bultena*, 797 A.2d 948, 958 (Pa. Super. 2002) (citing *Richette v. Pennsylvania Railroad,* 187 A.2d 910, 917 (Pa. 1963)).  The Former Clients have done so as is their right.  This then leaves us with a consideration of quantum meruit.

Pennsylvania courts have held that a terminated attorney is precluded from claiming contractual remedies.  *Angino*, 131 A.2d at 509-11.  In *Angino*, the Court held that a discharged attorney may not assert a contract claim under a termination clause, but rather may only recover in quantum meruit, as "a lawyer may not penalize a client for discharging him or her."  *Id* at 510. The Court further stated that to do so would constitute "a violation of the fiduciary relationship between attorney and client."  *Id.*  We find these principles applicable here, particularly where the termination clause in Paddick's contract was similar in nature to that in *Angino*, as both stated that upon termination the attorney could recover a percentage of the ultimate recovery along with fees—in Paddick's case, "40% of any settlement or judgment amount agreed to or obtained."  (M-2 at 2.)

What is left for the terminated attorney is to claim, as Paddick has done, that he is entitled to equitable remedies under quantum meruit.  To determine what a fair and reasonable fee under Pennsylvania law, we look to the following factors:

> the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*In re LaRocca's Tr. Estate,* 246 A.2d 337, 339 (Pa. 1968) (affirming the trial court's award of a $7,000 counsel fee award to attorneys who protected a minor beneficiary's interest in a trust during a five year dispute).

In addressing the *La Rocca* factors, we first consider the effort as measured in the time spent, which we are unwilling to criticize given that the range of the two cases together was extensive. Paddick needed to assess the working arrangements of Union members and faced challenges in addressing employment-based discrimination against the Union which, at least under Title VII, bears legal responsibility to maintain practices and procedures that give, as applicable here, opportunities for work to African Americans and women within the Union's arrangement with various contractors. This entailed a somewhat different analysis than a traditional employer/employee relationship that exists in the vast majority of employment cases. We credit Paddick for the work done following the remand with managing this challenge to the point of putting his Former Clients in a position to negotiate a respectable settlement. His briefings before this court were competently done and gave him enough to survive summary judgment with some claims, even where we found many others to be legally deficient.

We do not see strict applicability of all of the *La Rocca* factors as necessary. The "character of the services rendered" and "the importance of the litigation" can be answered with reference to the task before him when he accepted the first aspect of the engagement as he reviewed a case that the District Court had found deficient and followed through on remand. Certainly this was important work in support of admirable plaintiffs making a statement in support of advancing a claim not well received by the Union who had to fend off these claims. His work significantly contributed to the creation of the fund. He is entitled to fair compensation.

As Paddick can recover only under a quantum meruit theory, we look to his lodestar calculation as a starting point for the work he asserts he has done on the case. But, as mentioned in *Angino*, "[d]epending on the nature of the case, merely multiplying the hourly rate by the number of hours worked may be too narrow of an approach." 131 A.2d at 511.

Paddick's lodestar estimated that the fees and costs associated with the work on 09-4285 totaled $79,558.90, which is 220.9 hours at $350 per hour, plus $2,243.90 in costs. (M-4.) He estimated that the work on the 13-374 case totaled $16,984.51, which was 66.4 hours spent exclusively on that case at $250 per hour, plus $384.51 in costs not shared with the 09-4285 case. Although his billing rate was $350 per hour, he stated during the hearing, at least as to the 13-374 case, that he would accept $250 per hour. Based upon the equitable considerations outlined below, we apply this reduced rate to Paddick's work on the 09-4285 case. Thus, his recovery for that case would be $57,468.90. This brings his recovery to $74,453.41 for both fees and costs from both cases.

The Former Clients contest these billings, stating that they never received any bills until Paddick filed his motion for attorney fees. They also assert that his hourly rate is too high based on his "experience, reputation [and] knowledge." (Doc. 351 at 11.) The latter complaint is dealt with by our accepting the lower $250 hourly rate for the 09-4285 case as he indicated he would accept on the 13-374 case. Regarding the former complaint, the filings and testimony have brought to light that Paddick did not keep time in a contemporaneous fashion but rather created the invoice he presented to his Former Clients (M-4) in November 2017 as he was preparing to assert his lien. He described the source of his time records as a program showing when he logged on and off of his computer, when available, and when that program was not available, he provided a post-hoc estimate of the time it would take to complete certain tasks. He testified that

he does not normally keep close time records in contingency fee cases, which we understand to be the usual practice of attorneys working under such agreements. We do note these deficiencies, however, as they impact the credibility of the documents upon which we are asked to rely on as we assess the value of the work he performed.

We also note that Paddick certainly made a number of mistakes in communication with his clients: about the responsibilities of his clients in reimbursing litigation expenses, with Brown about her potential retaliation claim, about the billing he had done on their case, and about his approach to the subpoena of the DOL officials. We have considered these deficiencies, and conclude that our acceptance of that reduced rate for the work in the 09-4285 case is justified given the difficulties associated with Paddick's performance and the manner in which he calculated his lodestar.

We thus begin with the lodestar calculations asserted by Paddick ($74,453.41) and divide that number by five to account for the fact that that work was on behalf of Butt, Brown, Howard, and Mitchell for the 09-4285 case, and for Howard only in the 13-374 case. That would bring us to $14,890.68 per plaintiff, or $59,562.73 from the total fund. We reduce $5,000 for the amount paid by Howard from her Davis-Bacon Act claim (R-9 at 7). That brings the total sum for his lien to $54,562.73. We find that this amount reflects an equitable sum. An appropriate Order follows.

## II.     Recusal Motion

As stated above, also before the Court is a "Motion for Recusal" filed on February 12, 2018 by Butt, Brown and Howard. (Doc. 343.) Their motion was filed following proceedings on February 2nd and 7th regarding Paddick's charging lien and as we were about to embark upon a third day. They supplemented their filing the following day with an affidavit of Butt

concerning her observations and the opinions she came to hold concerning bias and partiality on the part of the Court. (Doc. 345.) Paddick and Mitchell filed a response in opposition to the recusal motion on February 14, 2018. (Doc. 348.) For the reasons set forth below, I do not believe that recusal is necessary to maintain the integrity of the judiciary. I deny the motion.

## A. The Applicable Law

The statute that the Former Clients cite in their request, 28 U.S.C. § 455, provides in relevant part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

28 U.S.C. § 455.[14] With respect to disqualification under § 455(b)(1), courts have held that the litigant must prove "actual bias or prejudice" "by compelling evidence," *Hook v. McDade*, 89 F.3d 350, 355 (7th Cir. 1996), and that the evidence of a "negative bias or prejudice . . . must be grounded in some personal animus or malice that the judge harbors against [him/her]." *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985). Courts have recognized the threshold for determining if this bias exists is whether a reasonable person would be convinced of the judge's bias, *see Hook*, 89 F.3d at 355, where a "reasonable person" is described as a "well-

---

[14]  A different statute, 28 U.S.C. § 144, also provides for reassignment of an assigned judge in the district court upon filing by a party of "a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party[.]" While the response of Paddick and Mitchell to the recusal motion focuses upon the Former Clients' compliance with this provision, they did not cite to § 144 in any of their filings. Therefore, we consider the recusal request under 28 U.S.C. § 455 only.

informed, thoughtful and objective observer, rather than the hypersensitive, cynical and suspicious person[.]" *Andrade v. Chojnacki*, 338 F.3d 448, 462 (5th Cir. 2003). The Supreme Court has explained that the "personal bias or prejudice" language of subsection (b)(1) "connot[es] a favorable or unfavorable disposition or opinion [towards an individual or his/her case] that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess …, or because it is excessive in degree[.]" *Liteky v. United States*, 510 U.S. 540, 550 (1994) (emphasis in original).

The opening subsection of this statute, 28 U.S.C § 455(a), separately requires a judge to recuse in any proceeding in which his or her "impartiality might reasonably be questioned." It thus encompasses a potentially broader array of judicial conduct and serves as a sort of "catchall" recusal provision, covering both "interest or relationship" and "bias or prejudice" grounds addressed by previous versions of 28 U.S.C. § 144 and § 455, "but requiring them *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky*, 510 U.S. at 548 (emphasis in original).

The bias, prejudice, or appearance of partiality requiring disqualification under 28 U.S.C. § 455(a) or § 455(b)(1) is not generally established *solely* by adverse rulings. In all litigation, judges make rulings adverse to one or the other party. As one trial court noted, an adverse ruling, while it may be "unwelcome[,] is simply too commonplace a circumstance to support an allegation of bias." *Marion v. Radtke*, No. 07-cv-243-bbc, 2009 WL 1373660 at *6 (W.D. Wis. May 14, 2009). Rather, as the Supreme Court emphasized in *Liteky*, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "[a]lmost invariably," judicial rulings "are proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555. In and of themselves, "*i.e..,* apart from surrounding comments or accompanying opinion," judicial

rulings "cannot possibly show reliance upon an extrajudicial source," and "can only in the rarest circumstances" evidence the "high degree of favoritism or antagonism" that would make fair judgment impossible and thus require recusal. *Id.*

The *Liteky* Court similarly found that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" do not provide a basis for disqualification "unless they display a deep-seated favoritism or antagonism that would make fair judgment possible." *Id.* Applying these principles to the context of statements made by the judge, the Court continued:

> Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id.* The Court provided an example of one circumstance where recusal was warranted due to judicial expression revealing a high degree of antagonism to German-American defendants in a World War I era espionage case because of their German heritage. *Id.*[15] But the *Liteky* Court emphasized that bias or partiality within the ambit of § 455 is not established by "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.* at 555-56. With regard to courtroom management, the Court added that "ordinary efforts of courtroom administration — even a stern and short-tempered judge's ordinary efforts

---

[15] The district judge was alleged to have stated that "[o]ne must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Liteky*, 510 U.S. at 555 (quoting *Berger v. United States*, 255 U.S. 22, 28 (1921)).

at courtroom administration — remain immune." *Id.* at 556.  Applying those principles, the Court in *Liteky* found that the various actions about which the defendants complained did not require recusal.[16]

## B.  Discussion

By their motion, the Former Clients challenge: (1) judicial rulings, specifically the Court's order granting Paddick's motion to intervene and seek to enforce a lien; (2) efforts at courtroom administration, with respect to time allotted during the first two days of the evidentiary hearing and the Court's effort to move the proceedings along; and (3) judicial comments in conferences and at the end of the second hearing day regarding the perceived merits of the parties' positions and the benefit of settlement of this dispute.[17]

---

[16]  The two defendants in *Liteky* sought recusal of the trial judge based on rulings he had made and statements he had uttered when he presided over an earlier case in which one of them was charged with similar offenses.  That same defendant also brought a second recusal motion based on the judge's admonishment of his attorney and of the codefendants.  The petitioners also pointed to questions the judge put to certain witnesses, an alleged "anti-defendant tone," his cutting off of testimony, and his denial post-trial of the petitioners' motion to appeal *in forma pauperis*. *Liteky*, 510 U.S at 556.  The Supreme Court concluded that recusal was not warranted on those bases:

> All of these grounds are inadequate under the principles we have described above:  They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses.  All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

*Id.*

[17]  Butt's affidavit also complains about the "body language" of the Court during the two days of the evidentiary hearing, suggesting that it conveyed partiality or hostility.  She asserts that the Court "stood up and pace[d]" behind the bench when Thompson questioned witnesses or when the Plaintiffs were on the stand, and that the Court "stood up over" Howard during her testimony, which Butt contends "was intimidating to" Howard.  (Doc. 345 at 5-6.)  I do not believe a

*(continued…)*

With respect to the first category, these recusal parties assert that the fact that the Court assumed jurisdiction of Paddick's charging lien demonstrates that it seeks to "assure … an outcome in favor of Attorney Paddick." (*See* Doc. 343 at 5.) I consider this to be a challenge to a judicial act, which does not support a recusal motion under § 455 except where the movant shows "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Litecky*, 510 U.S. at 555-56. I do not believe that any reasonable observer would find that to be the case here, particularly where I consider my attempt to resolve a fee dispute associated with the underlying litigation before the Court a sensible allocation of judicial resources and certainly not without precedent, and where, as here, the efforts of Paddick clearly contributed to the creation of the settlement fund.

With respect to the second category, the Former Clients cite to perceived differential treatment of them or their counsel during the two hearing days in terms of: allowing Paddick's witnesses to give long, unresponsive answers, or assisting by re-wording their testimony for them; limiting Thompson's cross, limiting testimony of Howard, and not allowing sufficient time for presentation of Plaintiffs' case in opposition to Paddick's motion; and "encouraging" negative information about Thompson while "limiting the introduction of negative information about" Paddick's performance. (Doc. 345 at 4-5) (*See also Id*. at 2 (referring generally to different treatment of counsel)). They believe this reflects that the Court has a "deep-seated" favoritism for Paddick, or antagonism against Thompson. (*See Doc.* 343 at 5) (*See also* Doc. 345 at 2 (describing perceived "personal bias against" Thompson and "favor to" Paddick)). I consider these actions to have been within the ambit of ordinary efforts at courtroom

reasonable, objective observer would consider the Court's physical mannerisms or demeanor to have conveyed any improper bias or prejudice, nor would these actions have lent an appearance of impartiality in this dispute.

administration here that the *Liteky* Court characterized as "immune" from recusal challenges under § 455(b)(1). *See Liteky*, 510 U.S. at 556. *See also Id.* at 555-56 (emphasizing that bias or partiality is not established by "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display"). These actions of the Court did not flow from bias or partiality towards either attorney participant. Nor do I believe that an objective observer, as envisioned by § 455(a), would reasonably question the Court's impartiality based on these courtroom administration efforts. *See Liteky*, 510 U.S. at 548 (describing perspective for § 455(a) evaluation).

The final subject of the Former Clients' complaints, and what appears to have been the tipping point leading them to file the recusal motion, was when I, two days into the hearing, shared with counsel my continued opinion that this dispute would be best resolved through settlement discussions. The Former Clients view this as evidence of a closed mind, arguing that it revealed that the Court intended to find in Paddick's favor from the beginning, before the Plaintiffs could be heard. Judicial comments only require recusal when they reveal an extrajudicial source or if they reveal a high degree of favoritism or bias. These comments fail to meet either criteria.

Even considering in the aggregate the actions about which the Former Clients complain, I conclude that the record does not indicate that excessive or inappropriate favor was shown to Paddick. While the Former Clients complain about how the first two days of the hearing were managed, that was when Paddick (and not the plaintiffs) was presenting his case. The parties opposing his motion were given time to put on their witnesses. The Court did not rush to judgment but rather permitted further briefing from the parties. We do not find the

circumstances of the litigation or the Court's statements concerning the case to be compelling evidence that the Court has "a personal bias or prejudice concerning a party" that would require recusal under 28 U.S.C. § 455(b)(1).

As for the alleged "deep-seated" and personal reactions to the attorneys, we do not find compelling evidence that would cause a reasonable person to conclude that the Court had formed any opinions that were "wrongful or inappropriate, either because [they were] undeserved … or because [they were] excessive in degree[.]" *Liteky*, 510 U.S. at 550. The Former Clients note that in a telephone call with the Court and Thompson concerning the settlement, I advised Thompson that it had been frustrated by her pre-trial submissions, which were disorganized, and commented that the format of her earlier opposition to a defense summary judgment motion had made the work of the Court in resolving that motion a bit more challenging.[18] The Former Clients assert that the Court's failure to critique the work of Paddick, who is also a solo practitioner, evidence a partiality towards Paddick. (Doc. 343-1 at 4-5.) I do not believe an objective, reasonable observer would consider this feedback to Thompson to reflect that the Court had formed any undeserved opinions towards her or her clients or that any reaction to counsel or the parties was excessive in degree. The statements concerning Thompson made a month before I became aware of any attorney fee dispute can hardly be said to reflect that the Court harbors any deep-seated favoritism for Paddick. Rather, I shared feedback in the interest of helping her improve as an advocate, which she did. The comments could not be reasonably

---

[18] As discussed above, the Former Clients' "Nunc Pro Tunc Response" in opposition to summary judgment stated that "Plaintiffs join in and incorporate by reference the Memorandum of Law filed by Plaintiff Mitchell ECF No. 172." (Doc. 177.)

understood to show an "undeserved" or excessively antagonistic opinion towards Thompson or her clients.[19]

I read a significant factor in the Former Clients' motion to be their perception that the Court "predetermined" the question of Paddick's lien prior to the conclusion of the evidentiary proceedings and the post-hearing briefing that was to follow. They cite to remarks, first made by the Court in telephone conferences with the parties following the filing of Paddick's charging lien and as the Court established briefing and hearing schedules, in the interest of encouraging the parties to settle their dispute about Paddick's claim to fees. The Court's remarks suggested that Paddick's claim to some sort of recovery appeared to be not unreasonable. As the Court anticipated — correctly — that the litigation of this request would involve substantial time and resources of the Court, counsel, and the parties, and in the spirit of my work as a settlement judge, I encouraged the parties to explore a non-judicial resolution of this dispute. (*See, e.g.,* Doc. 324 (memorializing referral, dating back to 12/8/17, to Judge Rice for settlement purposes)). When that failed, however, the Court proceeded with the necessary hearing on the motion.

When the second day of the hearing closed and it appeared that there was still additional testimony that needed to be heard, the Court again suggested that a settlement might be in everyone's best interest. The Court was certainly not prepared to make a ruling on Paddick's

---

[19]  Although not explicitly put forth in the motion or supporting brief, Butt's affidavit points out the racial composition of the litigants, counsel, and judge in this case. This Court has not been motivated by any racial animosity, nor do I believe that a reasonable, objective observer would question whether race factored into the Court's decision to permit Paddick to intervene or the Court's administrative efforts thus far. *Cf. MacDraw, Inc. v. The CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 963 (2d Cir. 1998) (declaring it "intolerable for a litigant, without any factual basis, to suggest that a judge cannot be impartial because of his or her race and political background").

motion, and clearly had no intention of doing so before the hearing concluded and the plaintiffs who opposed his request could be heard completely. I do not believe that anything about the remarks made at that point would have been taken by a reasonable observer as having reflected a fixed or immovable view about the merits of Paddick's request for a counsel fee for his work on behalf of his Former Clients. These remarks would not cause the Court's "impartiality … [to] reasonably be questioned." 28 U.S.C. § 455(a).[20]

I have considered whether the circumstances cited by the Former Clients in their motion to recuse rise to the level of compelling evidence that the Court "has a personal bias or prejudice concerning" them or Paddick, the intervenor here. They do not. I have also considered the separate question of whether the Court should recuse from the remaining proceedings in this case — resolution of Paddick's charging lien — because a reasonable, objective observer might question its impartiality. Notwithstanding the Court's comments conveying initial impressions about the merits of the motion to intervene and the Court's statements in aid of settlement, we do

---

[20] The Former Clients cite to *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995), a criminal fraud case. (Doc. 343-3 at 8.) There the district judge, who had also presided over a related civil action by the SEC, commented at the sentencing hearing regarding the restitution to award that "[his] object in [the] case from day one [had] always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." *Antar*, 53 F.3d at 573-74. The Court of Appeals agreed with the defendants that the judge's statement reflected an appearance that he had prejudged their guilt and that rulings were skewed by his determination to enforce the repatriation order in the civil case and "get back" money from the defendant. *Id.* at 574. The court characterized his statement as reflecting "a high degree of antagonism against a criminal defendant," and suggested he might have effectuated his goal by giving the government "as free a road as possible towards a conviction," and "it goes without saying that this is an improper role of a district court judge during a criminal trial." *Id.* at 576.

The Former Clients here allege that the Court effectively communicated to them in statements prior to and during the evidentiary hearing that it had a "goal" which it sought to effectuate: that Paddick be paid from the funds recovered by the moving plaintiffs and/or the fee due to Thompson. (Doc. 343 at 2-3, 5.) We find the present case to bear no similarity to that of *Antar*, in that the Court's comments have in no way suggested that proceedings on Paddick's motion were conducted as to effectuate any "goal" of the Court with respect to the outcome.

not believe that a reasonable observer considering the totality of the circumstances would believe that the Court was acting based upon bias, prejudice, or any other improper motive.  Our Order follows.

### III.    Conclusion

The various assertions made by both parties in this case have been recounted thoroughly as we analyzed evidence produced to support and respond to the Enforcement Motion and the Recusal Motion.  We conclude that Paddick has provided sufficient evidence to support a charging lien to which we award a sum on a quantum meruit basis of $54,562.73.  We have denied, however, any entitlement to recover from the settlement fund any allegedly unpaid fees under the Appellate Agreement.  We further found no support for accepting jurisdiction to recognize Butt's "Motion to Recognition and Enforcement of Lien," and thus it is denied. Finally, we have denied the Recusal Motion.

An appropriate Order follows.


BY THE COURT:


_/s/ David R. Strawbridge, USMJ_____
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE